JIN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

DEC 20 2024

ARTHUR JOHNSTON
BY _____ DEPUTY

JOHN H. WADE, III                                                         PLAINTIFF

VS.                                        CIVIL ACTION NO.: 2:24cv196-TBM-RPM

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION          DEFENDANT

---

## COMPLAINT FOR INJUNCTIVE RELIEF

---

1.      Plaintiff John H. Wade, III ("Wade") brings this action to challenge Bylaws

12.02.6, 12.8, and 14.3.3 (the "JUCO Eligibility Limitation Bylaws") of Defendant, the National

Collegiate Athletic Association ("NCAA"). These bylaws reduce the number of years college

basketball players can play Division I NCAA basketball and unjustifiably restrain the ability of

these college athletes to earn money through use of their name, image, and likeness ("NIL")

connected to their work as Division I basketball players. This action seeks declaratory and

injunctive relief against Defendant for a violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

### INTRODUCTION

2.      In a landmark 2021 decision (*NCAA v. Alston*, 594 U.S. 69 (2021)), a unanimous

U.S. Supreme Court paved the way for college athletes[1] to receive compensation for use of their

names, images, and likenesses ("NIL Compensation") due to the NCAA's violation of antitrust

laws. The market realities of college sports have changed tremendously over the last forty years.

For instance, from 1982 to 1984, CBS paid $16 million per year to televise the March Madness

Division I men's basketball tournament. In 2016, those annual television rights brought in closer

---

[1]   The lawsuit avoids using the term "student athlete" because it "is an NCAA marketing invention designed to 'conjure the nobility of amateurism,' assert 'the precedence of scholarship over athletic[s],' and 'obfuscate the nature of the legal relationship at the heart of a growing commercial enterprise.'" *Wadeson v. NCAA,* No. 12-1223 (3rd Circuit Jul. 11, 2024).

to $1.1 billion. As a result, the NCAA is no longer even arguably entitled to any "sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade." *Id.*

3.      Reacting to the lecture it received in *Alston*, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation on July 1, 2021. In the three years since, the market for NIL Compensation opportunities available to NCAA Division I athletes has exploded, with the 2024 college sports NIL market estimated at over $1 billion.[2] Significantly, those NIL Compensation opportunities are virtually only available to NCAA Division 1 athletes. The five-year eligibility rule of Bylaw 12.8, limiting players to play college sports, neither promotes competition nor benefits college athletes. The JUCO Eligibility Limitation Bylaws similarly restricts college athletes from NIL opportunities unlike college freshmen in Division I basketball. This rule stifles the competition in the labor market for NCAA Division I basketball players, harming college athletes and degrading the quality of Division I basketball consumed by the public. These harms are contrary to Defendant's stated mission of promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy. Wade, and other similarly situated basketball players who are harmed by this illegal restraint, have a small window of time to compete in Division I basketball. Because Wade cannot relive his short college career, the harm inflicted by the Bylaws is irreparable and ongoing, and temporary and preliminary injunctive relief is necessary.

4.      Wade brings this action to put a stop to the unjustified anticompetitive restriction on universities who seek to compete for college athletes, and to restore freedom of economic opportunity for himself and other college basketball players.

---

[2] *See* Ex. 1, "NIL at 3: The Annual Opendorse Report" at p. 4.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

6.    This Court may exercise personal jurisdiction over Defendant NCAA because Defendant currently transacts business in the Eastern Division of the Southern District of Mississippi. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Eastern District of Mississippi.

7.    Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2).

## THE PARTIES

8.    Plaintiff Wade is a college basketball player at The University of Southern Mississippi ("Southern Miss") and resides in Hattiesburg, Mississippi. He played JUCO and Division II basketball, all in California, before transferring to Southern Miss.

9.    Defendant NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Southern District of Mississippi. These member institutions are organized into three divisions, and Division I includes over 350 schools. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaws at issue in this case, Division I Bylaws 12.8, 12.02.6, and 14.3.3. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be

amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

10.    As a practical matter, an academic institution that wishes to participate in any meaningful way in collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."

11.    The NCAA and its member institutions control the highest and most popular level of collegiate athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for an undergraduate academic education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must by necessity attend an NCAA Division I member institution.

12.    There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

## FACTUAL BACKGROUND

13.     After playing three seasons of college basketball, Wade graduated and entered the

transfer portal, signing to play at Southern Miss for the 2024-2025 season. The NCAA denied

him the opportunity to play his fourth season based on the Five-Year Rule of 12.8. On July 23,

2024, the NCAA staff denied Wade's request for an eligibility extension waiver. Exhibit "2." On

the same date, Southern Miss appealed the decision. On October 25, 2024, the NCAA upheld the

staff decision on the basis that Wade had not been denied two years of participation opportunities

beyond his control. On November 17, 2024, Wade filed an appeal of the decision for his

eligibility extension waiver and on December 3, 2024, the NCAA canceled the request for

reconsideration and left intact the original denial. All administrative procedures have been

exhausted, from which this lawsuit is filed.

### I.     John H. Wade, III's Collegiate Career

14.     Though previously documented throughout the initial application and appeal, the

chart below is provided to help summarize Wade's history and how the NCAA has calculated and

viewed his years of eligibility and seasons of competition.

| Academic Year | Institution | NCAA's Analysis of Years of Eligibility under Bylaw 12.8.1 | Seasons of Competition | Notes from NCAA Case and Staff Summary |
|---|---|---|---|---|
| 2018 – 2019 | University of California, Davis | #1 | N/A | "Mr. Wade III initially enrolled full time during the 2018-19 academic year at the University of California, Davis (UC Davis) and did not compete given he was not a member of that institution's men's basketball team." |
| 2019 – 2020 | Contra Costa College (JUCO) | #2 | #1 | |
| 2020 – 2021 | Contra Costa College (JUCO) | #3 | N/A | "SA did not compete. [Contra Costa College] cancelled men's basketball season due to COVID-19 pandemic." |

| 2021 – 2022 | Contra Costa College (JUCO) | #4 | #2 | |
|---|---|---|---|---|
| 2022 – 2023 | California State, Northridge (Div. I) | #5 | Denied participation opportunity via medical hardship | "Mr. Wade III also received a medical hardship waiver for the 2022 – 2023 academic year when [he] was enrolled at Cal. State University, Northridge (CSUN) which is considered a denied participation opportunity." |
| 2023 - 2024 | California State, Stanislaus (Div. II) | #6 | #3 | "Mr. Wade III received a season-of-competition and extension-of-eligibility waiver for the 2019-2020 academic year . . . which he used during the 2023 – 2024 academic year." |

15.    Pursuant to Bylaw 12.8.1.7.1(a), the NCAA staff and the Committee evaluated Wade's request for an extension of eligibility by looking for two seasons when Wade was denied a participation opportunity. Given that the Covid waiver did not count as a participation denial and that the 2022 – 2023 season was unequivocally considered a denial opportunity based on a medical hardship, NCAA staff and Southern Miss staff focused all prior documentation on the 2018 – 2019 year at UC Davis to evaluate whether it qualified as a denied participation opportunity.

16.    As previously noted, Wade did not play collegiate basketball his first year in college. He was not a student athlete. He did not play because he did not have the opportunity to play. He hit a growth spurt as a freshman and through his hard work, he created additional opportunities for himself the following year. Southern Miss's position—that Wade otherwise meets the criteria under 12.8.1.7.1(a) to qualify for a redshirt during the 2018 – 2019 season—remains true. He is a smart student and hardworking athlete who has only played three seasons of collegiate basketball. Had he been a few inches taller at age 18 and simply listed on a roster, the appeal and this lawsuit would not be necessary, and he would have his eligibility extended a year under Bylaw 12.8.1.7.1(a). On this ground alone, Wade should be eligible.

17.    Further, Southern Miss's position is bolstered by the current legal challenges against the Five-Year Rule under Bylaw 12.8 as well as the Intercollegiate Competition Rul of 12.02.6 and the JUCO Eligibility Limitation Bylaw of 14.3.3. In *Diego Pavia v. NCAA*, another student athlete has challenged the fairness and legality of the eligibility clock beginning to run at the time of enrollment, rather than when a student actually qualifies as a student athlete.[3] For Wade, this is the difference in his clock starting to run during the 2018 – 2019 season, when he was not a student athlete, and it beginning when he was actually on a team. Starting Wade's eligibility clock when he was actually a student athlete changes his eligibility for the 2024 – 2025 season, and directly impacts his ability to participate in NIL opportunities for a year in Division I.[4]

18.    Further, his previous three seasons of play were in JUCO and Division II, schools in which he had no opportunity to NIL compensation. On December 18, 2024, the district court issued a preliminary injunction, finding the subject Bylaws violated the Sherman Act.[5]

**II.    Abusive 2022 – 2023 Season at California State University Northridge**

19.    More recently, Southern Miss learned the complete story of Wade's "medical hardship" at California State University Northridge (CSUN) from 2022 – 2023. That title does not accurately describe what was actually a mental health hardship due to verbal and physical abuse at the hands of the head coach.

20.    This medical hardship was described by the NCAA in its Case Summary on appeal as "SA competed. SA suffered a season-ending injury. SA received an approved hardship

---

[3] *See generally* Mark Schlabach, *Vanderbilt QB Diego Pavia suing NCAA over eligibility rules*, ESPN (Nov. 9, 2024), available at https://www.espn.com/college-football/story/_/id/42286584/vanderbilt-qb-diego-pavia-suing-ncaa-eligibility-rules.
[4] Compl. at ¶ 3, *Diego Pavia v. NCAA*, No. 3:24-cv-01336 (M.D. Tenn. Nov. 8, 2024) (noting significant differences in NIL compensation opportunities between Division I and non-Division I athletes).
[5] Memorandum, *Diego Pavia v. NCAA,* Doc. 41.

waiver from [CSUN]'s conference office." Again, that season-ending injury was verbal and physical abuse from the head coach. Combined witness statements, Exhibit "3."

21.    In particular, other players witnessed the head coach of CSUN intentionally knock a water bottle out of Wade's hand, grab him by the shirt and get in his face, and throw a basketball at the back of his head. Wade and another player were asked about their mental states in front of the entire team, and regularly told by the coach that he did not want them as part of his team or participating in team events, like travel. These players were verbally and physically abused, and it took a steep mental toll.

22.    By the fall of 2022, Wade's parents started noticing that their son had lost weight and was isolating from them. When they were able to talk to him, he seemed anxious and depressed—a markedly different disposition than they were used to seeing in their positive son. In response, they began to speak with other parents of players on the team. At this point, they were told that Wade and another player were being verbally and physically abused by the head coach. Wade's parents immediately stepped in, understanding the serious signs of depression in their son and realizing he needed professional help. From there, Wade saw mental health professionals, and to their credit, CSUN compliance submitted a hardship waiver to the Big West Conference on Wade's behalf.

23.    These horrible incidents are detailed in a letter from Wade's parents, John H. Wade, II and Arthurnelle Wade detailing their experience during the 2022 – 2023 year. Additionally, there is a prior email from Wade's parents to the CSUN Director of Athletics advising him of Wade's experience in real time. There is also a letter from a doctor and a social worker that Wade saw in the winter and spring of 2023, which documented his depression. There are also two letters from Wade's former teachers and coaches before CSUN. In their letters, they

8

describe a happy dedicated student athlete, which is not what the Wades saw in their son at CSUN.

24.     This information is important, in part, because of the NCAA's focus on student athlete mental health. As the NCAA knows well, the mental-health challenges of student-athletes have become a more prevalent topic during and since the pandemic, and the studies show that "[m]ental health concerns [are] highest among respondents of color, those with families facing economic hardship and those living alone."[6]

### III.    Necessity of Eligibility Extension

25.     This information regarding the abuse Wade experienced at CSUN, and its subsequent mental health impact, is also important because it makes even more clear that Wade should receive an additional year of eligibility.

26.     In practical terms, Wade lost a season of play *and* a year of eligibility because of the abuse of a coach. Yet, the hardship waiver he received in response only provided him with an additional season of play. This sends a particularly draconian message to Wade that though you were abused by a coach, you will be punished for it. Without an extension of his years of eligibility, the hardship waiver from the Big West did not provide any actual relief.

27.     The self-imposed Covid waiver provides for both season-of-play *and* years of eligibility to be extended. Yet here, where mental health was the reason Wade lost both a season and a year, no such dual extension is available.

28.     In the *State of Ohio v. NCAA* matter, the final permanent injunction entered by the District Court of West Virginia provided for an "additional *year of eligibility* to any Division I

---

[6] NCAA, *NCAA Student-Athlete COVID-19 Well-being Survey: Survey Results – May 2020,* available at: https://ncaaorg.s3.amazonaws.com/research/other/2020/2020RES_NCAASACOVID-19SurveyPPT.pdf.

student-athlete who was deemed ineligible to compete for a season or any portion of a season of competition occurring during or since the 2019-2020 academic year" if that student athlete had previously transferred twice between member institutions. Wade is effectively in the exact same situation as many of the student athletes who were forced to transfer due to mental health reasons and in the process lost a year of eligibility. Yet, Wade has not received the same relief. The arbitrary nature of this limitation on his ability to compete is incredibly suspect.

## IV.    Four Year Colleges Are Governed by the NCAA.

29.    The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion."[7] "The NCAA, then known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college sports. Today, the NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. The NCAA comprises three Divisions. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors."[8]

30.    But while the NCAA started out as a small nonprofit organization, its economic power has grown exponentially over the last 120 years. Today, "the NCAA generates approximately one billion dollars in revenues each year…. The FBS conferences have a multi-year media contract with ESPN for the College Basketball Playoff, the total value of which is $ 5.64

---

[7] 2024-25 NCAA Division I Manual, attached hereto as Exhibit 2.
[8] *In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation*, 375 F. Supp. 3d 1058, 1062 (N.D. Cal. 2019) (internal citations omitted) (invalidating other NCAA rules limiting the ability of college athletes to earn money).

billion. The five conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them…. [The] SEC made more than $ 409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $ 650 million that year[]. The revenues of the Power Five [now Power 4] have increased over time and are projected to continue to increase."[9]

31.    It is the NCAA's mission to "provide student-athletes with the opportunity to **participate in sports and compete as a vital, co-curricular part of their educational experience**.... The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an **integral part of the education program** and the student-athlete as an integral part of the student body." 2024-25 NCAA Manual (emphasis added). In other words, the NCAA concedes that the ability to participate in college sports is both "vital" and "integral" to the four-year college experience.

### V.    Junior Colleges Are Governed by The NJCAA.

32.    In contrast to the four-year colleges governed by the NCAA, most two-year colleges ("Junior Colleges") are governed by the National Junior College Athletic Association ("NJCAA"),[10] which has no affiliation with the NCAA. Each year, more than 60,000 student- athletes from 500 member colleges compete in 27 different sports. While the NCAA generates billions of dollars in revenue while televising nearly all Power 5 [now Power 4] conference games, it took the NJCAA until 2022 to reach an agreement with ESPN to nationally televise just one NJCAA game (the junior college national championship game), with 13

---

[9] *Id.* at 1063.
[10] One hundred junior colleges in California are governed by the California Community College Athletic Association, which also has no affiliation with the NCAA.

additional games available through an online streaming platform.[11] In short, playing for a junior

college is not a comparable alternative to playing Division I College Basketball in terms of

exposure—either to generate income while in college through NIL Compensation or to NFL

scouts for future career opportunities.

**VI.    The NCAA Is Governed by Self-Created Bylaws That Discriminate Against Junior College Athletes.**

34.    Each NCAA division maintains its own bylaws, with amendments proposed

by member institutions. *See* Ex. 6 at pp. 14, 17-18. Each NCAA member school is required to

"hold itself accountable to support and comply with the rules and principles approved by the

membership." *Id.* at p. 9. Several of the bylaws applicable to Division I schools are at issue

in this lawsuit.

**A.    The Five-Year Rule and Eligibility Clock: NCAA Bylaw 12.8**

35.    Under NCAA Bylaw 12.8, an athlete has five years of eligibility to play

four seasons of "intercollegiate competition" in his or her chosen sport (the "Five-Year Rule").

The athlete's five-year window is known as an "Eligibility Clock" and starts to run from the date

on which an athlete registers as a full-time student at any "collegiate institution," whether or not

such institution is a member of the NCAA and whether or not the athlete competes in any sport

at the non-NCAA institution. Ex. 6, at p. 66, NCAA Bylaw 12.8.1

36.    The NCAA's Guide for Two Year Transfers has a section on the Eligibility

Clock, where it explains that the purpose of the five-year rule is to "move student-athletes

toward graduation in a timely manner." Ex. 5, NCAA Guide for Two Year Transfers 2024-25 at

---

[11] *See* 2022-23 NJCAA Annual Report at p. 18 (last viewed on November 3, 2024 at https://www.njcaa.org/about/annual_report/index).

p. 21. In other words, the NCAA concedes that the Five-Year Rule is not designed for any pro-competitive purpose.

37.     The irrelevance of the Eligibility Clock start date to competitive balance becomes even more apparent when one realizes that the five-year clock begins to run whether a student plays a sport or not. Under the Bylaw, a student can attend a junior college for two years without playing any sports, obtain an associates degree, transfer to a four-year NCAA school, and the student still only has three years of eligibility to play three seasons of basketball—and earn NIL.

38.     In contrast, a student who graduates from high school, plays basketball at a prep school for a post-grad year, and then attends an NCAA school still receives five years of eligibility to play four seasons. Similarly, a student who graduates high school and becomes a professional athlete in another sport can play that other sport for years, then go to college and still have five years of eligibility to play four seasons of a sport – as long as it is a different sport than they played professionally. The NCAA rules do not limit the ability of the former professional athlete to profit from NIL while playing Division I basketball, even though they have had a chance to physically mature well beyond a typical 18-year-old college freshman. Accordingly, it is apparent that the Five-Year Rule does not exist for reasons of competitive balance else it would preclude other older athletes from competing in Division 1 NCAA sports.

**B.      The "Intercollegiate Competition Rule": NCAA Bylaw 12.02.6**

39.     The NCAA defines "intercollegiate competition" as "occur[ring] when a student-athlete in either a **two-year** or a four-year collegiate institution does any of the following: ... (a) Represents the institution in any contest against outside competition." Ex. 6 at p. 46, NCAA Bylaw 12.02.6. In other words, while junior colleges are not part of the NCAA

monopoly and JUCO athletes have no meaningful opportunity to earn NIL Compensation, the NCAA still subtracts one season of NCAA Division I eligibility from an athlete for each year he/she competes at a junior college.

### C.    The "Three Year Transfer Limitation": NCAA Bylaw 14.3.3

40.    In addition to the Five-Year Rule and the Intercollegiate Competition Rule, the NCAA also limits all junior college attendees to a maximum of three years of NCAA Division 1 competition – regardless of whether they compete in a junior college sport: "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." Ex. 6.

at p. 161, NCAA Bylaw 14.3.3. There is no pro-competitive justification for this rule that takes away one year of Division I basketball competition (with corresponding NIL Compensation opportunities) from students who choose to attend junior college before transferring to an NCAA school, as compared with athletes who enroll directly in a school that is a member of the NCAA monopoly.

41.    The NCAA amplified the magnitude of the anticompetitive nature of the Three Year Transfer Limitation during the Covid pandemic when it issued guidance allowing some students to compete for more than four years in a window greater than five years. Specifically, any student that enrolled at an NCAA Division 1 school in the Fall of 2020 received a one-year extension on their Eligibility Clock **and** had their 2020 disregarded as a season of participation, effectively giving them six years to play five seasons at the NCAA Division 1 level (the "Covid Extension").[12] For instance, one athlete, Bo Nix, started at quarterback for Auburn University

---

[12] *See* Ex. 6, NCAA Division I COVID-19 Self-Applied Waiver Relief for Season of Competition and Extension of Eligibility. The NCAA subsequently extended the Covid Extension to non- NCAA athletes,

for three seasons, then transferred to the University of Oregon and started at quarterback for two additional seasons, starting in a record total of 61 Division 1 football games during his career before being selected in the first round of the 2024 NFL draft.[13]

42.     The anti-competitive nature of the Covid Extension combined with the Three-Year Transfer Limitation is facially apparent. Under the Three-Year Transfer Limitation, the NCAA already disadvantaged former junior college players by limiting them to three seasons of Division I competition in comparison to the four seasons granted to all other basketball players. Then, the Covid Extension increased the four-season limit to five seasons for basketball players who enrolled in Division I schools upon high school graduation, while leaving the three-season limit in place for JUCO transfer athletes. Instead of having one less year of NCAA Division I competition, former JUCO basketball players (like Wade) now have two fewer years.

**D.     The "Rule of Restitution": NCAA Bylaw 12.11.4.2**

43.     If the Court grants Wade injunctive relief, it must also address NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," which provides:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions . . .

---

like Pavia, who were both eligible and competed at non-NCAA schools in 2020. However, this extension did not appear to remove the Thee-Year Transfer Limitation for such athletes.
[13] *See* https://en.wikipedia.org/wiki/Bo_Nix.

Ex. 6 at 65-66, NCAA Bylaw 12.11.4.2. Potential punishments under the Rule of Restitution include vacating wins, postseason bans, return of television revenue, and financial penalties, among others. *Id.* To make a temporary restraining order and preliminary injunction meaningful in this case, Wade respectfully requests that the Court enjoin the NCAA's application of the Rule of Restitution against Wade, Southern Miss, or any other NCAA Division I college to which Wade could transfer because its "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *State of Ohio*, 706 F.Supp.3d at 601.

## RELEVANT MARKETS

44.     The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States.

45.     There are no alternatives to the NIL Compensation opportunities or other benefits college basketball players receive from participating in NCAA Division I basketball.[14] The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. Within this market, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for participation in Division I athletics. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions

---

[14] *See* Ex. 1, "NIL at 3: The Annual Opendorse Report" at p. 4.

from the sizable consumer interest in college athletics. And, as a practical matter, NIL opportunities are only available college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those athletes. *Id.* at footnote 17. Wade had no reasonable opportunity to earn any NIL Compensation, and earned none, when he played at junior college.

46.     Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college basketball players. Namely, these transactions include partial or full scholarships in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, the transactions between these member institutions and the college athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

## ANTICOMPETITIVE EFFECTS

47.     The NCAA enacts and enforces rules that it claims promote the well-being of college athletes and preserve the amateurism aspect of Division I college sports.

48.     The NCAA and its member institutions adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I college basketball players.

17

49.     Despite what the NCAA may claim, the Bylaws restrain college athletes from improving their economic opportunity, personal growth, and well- being with NIL opportunities, through a full four-year college playing experience, a freedom afforded to all athletes who enroll at NCAA Division 1 members as freshman, but not to junior college basketball player transfers. These restrictions violate the Sherman Act because they have direct anticompetitive effects that harm college basketball players and consumers of college basketball.

50.     The Five-Year Rule application to students who have no opportunity to play restrains competition. The JUCO Eligibility Limitation Bylaws punish athletes who attend JUCO but have no right to NIL compensation and limit their eligibility to compete.

## LACK OF PROCOMPETITIVE JUSTIFICATION

### I.     There is No Procompetitive Justification for the Bylaws

51.     Because the above demonstrates the anti-competitive effect of the Bylaws on the Division I labor market for basketball players, like Wade, and the consumer market for persons watching college basketball, the burden shifts to the NCAA to prove a procompetitive justification for the Bylaws.

### II.    Any Potential Procompetitive Justifications for the JUCO Eligibility Limitation Bylaws Could Be Accomplished by Less Restrictive Means

52.     Even if the academic and amateurism goals of the NCAA were valid procompetitive justifications (and they are not), both goals could be accomplished through less restrictive alternatives, some of which are already in place within the NCAA bylaws. For example, NCAA Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events. *See* NCAA Bylaw 14.4.1. Other NCAA Bylaws require minimum credit hour and grade point averages for college athletes to be eligible for competition. These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic and

amateurism goals without the unjustified restrictions imposed by the JUCO Eligibility Limitation Bylaws.

## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT:
## THE BYLAWS

53.     Wade repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

54.     Defendant NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the Bylaws: NCAA Bylaws 12.8 (the Five Year Rule), 12.02.6 (the Intercollegiate Competition Rule), and 14.3.3 (the JUCO Eligibility Limitation Bylaws.)

55.     The market for athletic services Division I basketball is the relevant antitrust market. The transactions between NCAA member institutions and college basketball players in this market are commercial in nature and fall under the purview of the Sherman Act.

56.     This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from retaining the services of an athlete, like Wade, for the four or five years they are permitted to retain the services of other college basketball players.

57.     Defendant's conduct is ongoing and will continue to impose injury on current and former athletes and consumers of college basketball unless injunctive relief is granted.  This ongoing harm from the Bylaws has caused, and continues to cause, direct harm to Plaintiff Wade by restricting his ability to sign contracts for NIL Compensation extending beyond the 2023-2024 basketball season and limiting his future opportunities to showcase his skills and

talent for NBA personnel, and does so as an unreasonable restraint on the labor markets for college basketball players.

35.    Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

36.    Wade asks for a preliminary restraining order, preliminary injunction, and permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Wade, and from enforcing NCAA Bylaw 12.11.4.2 to punish Wade, Southern Miss, and any other NCAA member institution for actions taken in compliance with any orders from this Court. Wade also asks the Court to explicitly rule that he is entitled to play Division I college basketball in the 2024-25 school year.

## COUNT II: THE DECISION OF THE NCAA IS ARBITRARY AND CAPRICIOUS

37.    The NCAA determined that Wade's decision to enroll in college as a freshman, though not having an opportunity to play Division I basketball, counted as a year against his five-year eligibility because the circumstances where within his control per 12.8.1.7.1.2. The applicable regulation states that an athlete may be granted a waiver of the eligibility five-year rule if he is deprived of the opportunity to participate for more than one season in his sport for reasons that are beyond his control or that of the institution. In this instance, under the totality of the circumstances, the evidence presented to the NCAA overwhelmingly established that Wade's decision to enroll in school as a student should not be counted against his five-year eligibility. He experienced a significant growth spurt his freshman year, well documented, and after the biological growth process and hard work, he had his first opportunity to participate in basketball

his sophomore year. If Wade had chosen to not go to college for a year, he would have a fifth year of eligibility. Under these circumstances, his physical inability to play his freshman year was beyond his control and further, at a minimum, the evidence provided to the NCAA establishes circumstances of extraordinary or extreme hardship which allow an additional one-year extension and waiver of the Five-Year Rule, per 12.8.1.7.1.3.

### PRAYER FOR RELIEF

WHEREFORE, Wade respectfully requests that this court:

1. Adjudge and decree that Defendant's enforcement of NCAA Bylaw 12.8, 12.02.6, and 14.3.3 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Wade, and from enforcing NCAA Bylaw 12.11.4.2 to punish Wade, Southern Miss, and any other NCAA member institution for actions taken in compliance with any orders from this Court;

3. Adjudge and decree that the NCAA denial of the one-year extension was arbitrary and capricious under 12.8.1.7.2 and 12.8.1.7.1.3.

4. Award Wade a fourth season of NCAA Division I competition and eligibility to take place in 2024-25 to avoid harm caused by NCAA Bylaws 12.8, 12.02.6, and 14.3.3;

5. Award Plaintiff Wade his costs, including reasonable attorneys' fees; and

6. Order any other relief that this Court deems just and proper.

RESPECTFULLY SUBMITTED, this the  20  day of December, 2024.

Clark Hicks

L. CLARK HICKS, JR., (MSB NO. 8963)
*Attorney for Plaintiff, John H. Wade, III*

21

HICKS LAW FIRM, PLLC
211 South 29th Avenue, Suite 201 (39401)
Post Office Box 18350
Hattiesburg, MS  39404-8350
Telephone:    601.544.6770
Email: clark@hicksattorneys.com